Administrator, U.S. Environmental Protection Agency. Mr. Volchok, amicus curiae for the appellant. Mr. Walker for the appellate. Good morning. May I please the court? Daniel Volchok, amicus appointed, in support of the plaintiff Ghulam Ali. Your honors, my submission is that reversal is required because a reasonable jury, viewing the record in the light most favorable to Mr. Ali, could return a verdict for him on his reasonable accommodation claim. For example, a jury could find that EPA failed to provide a reasonable accommodation, find that the remote work accommodation EPA offered was not reasonable. It wasn't reasonable, a jury could find, both because it would have harmed his colleagues and the workplace, and because it would have exposed him to significant health risks, a severe allergic reaction to emissions from his home printer. Now, EPA's principal response is that the agency did not know at the time about the printer issue because Mr. Ali did not explain it. But he did, or at least a reasonable jury could find that he did, crediting evidence in the record about a contemporaneous explanation. That's sealed J.A. page 50, J.A. page 89, J.A. page 236. The court doesn't need to go any further to reject this argument about ignorance of the printer issue, but a jury alternatively could find that if EPA didn't know about the issue, that was the agency's fault, that the agency specifically told Mr. Ali to respond to its offer of full-time remote work without an explanation, with simply a quote, yes or no. That's J.A., again, page 89, and J.A., page 171. Does your argument about whether EPA should have followed up turn at all on the fact that while their notice to Mr. Ali said that we will talk with you before we take to work on a reasonable accommodation, they in fact never talked to him and just issued this work-at-home accommodation? So that is a key part of our argument, Judge Millett, that EPA had the same obligation under cases like Ward v. McDonald that Mr. Ali did to try to move the process forward. And they didn't. In fact, they repeatedly obstructed the process. He sent email after email trying to resume the discussions with EPA about his request for reasonable accommodation. I'm talking about even the starting point. Their starting point was they asked for information about his disability, and he followed up, and they found that satisfactory, unlike Ward. They found it satisfactory. And then issued a notice saying, we find you have a disability. We will talk with you, and then we will work on a reasonable accommodation. We have discretion in the final decision. But in that, I don't know whether it's the same minute, but within an hour or so, they issued work-at-home. That's a reasonable accommodation, at least as best I can tell from the record, without having actually ever done what they said they would do, is talk with you about what accommodations will work. They simply dropped this accommodation proposal on him without any of that dialogue. That's correct. There's no indication. Did they even start an interactive process? There's no, well, their position is that the interactive process, and I think this part is actually right, the interactive process includes exchanges of information between employer and employee about the nature of the disability. So when they were asking him to follow up with additional medical evidence, I think that is fairly viewed as part of the interactive process. Sure, but on the what accommodations going to work, it seems like there was, they didn't, having said they were going to talk with him, didn't just announce, here's your accommodation. That's absolutely right, Judge Millett, and that is a reason that a reasonable jury, viewing it as in the light most favorable to Mr. Ali, could return a verdict for him. That is bad faith participation. They didn't actually have any sorts of backs, back and forth with him. Now, they have an argument, you can't be held liable just for bad faith participation if the accommodation is otherwise reasonable. I think that's wrong, both on the law and on the facts here. It's wrong because it would encourage agencies to do exactly what happened here, which is to take sort of a my way or the highway approach rather than having the- All these events occurred in 2012, is that right? Late 2011 through early 2013, Judge Randolph, but the offer of the accommodation was in June 2012. So what happened after he declined the option of working at home? So his position, if I can, I want to go directly to your question, Judge Randolph, but just a threshold response. He objected to work at home, but EPA jumped to the conclusion, in our view, that that was a definitive rejection without telling him that they were jumping to their view. But whether it was- He was just bluffing, is that all? No, I think he was expressing objection, but the- He said that's not an option. He said, I have thought about this- I'm unclear about that. All right, so I don't want to get hung up on this, Judge Randolph, because I don't think it matters whether or not it was a definitive rejection, but I think it's viewing the light in this posture, viewing the light in the record most favorable to Mr. Ali. So my question is, from 2012 on, he rejected the offer to work at home, and he rejected the idea that he could work from a cubicle in the office building, right? So the district court disagreed that he actually rejected that accommodation, and now EPA has flipped to telling- What happened to him? Sure. So through late 2012 and into 2013, he tried to continue the discussion with EPA about a reasonable accommodation. But in terms of on the ground, the record shows that he was essentially trying to make things work. He was going from cubicle to cubicle, trying to find one where his allergies would not be triggered, and EPA, as part of its argument that it offered a reasonable accommodation in the cubicle, points to JA-72, where Mr. Ali testifies to the EEO, I found a cubicle that became my cubicle, EPA cites that. You go two or three paragraphs later in the same testimony, JA-73, and he says, but actually, even that cubicle didn't work because there was someone there with perfume. But he's bouncing around and trying to make things work. Ultimately, Judge Randolph, and I think it's 2014, but much later, EPA does give him a private office, and he has had a private office since then. Now I do want to get back to the point- Your case rests on the actions in 2012, right? 2011 through 12, 2012 and 2013. You're not seeking an injunction, are you? No. Well, so to be clear, your honors, I don't represent Mr. Ali. I'm meek as appointed by the court, but his complaint asks for retroactive promotions and pay damages for emotional suffering. He does not request any sort of injunction, no. But I do want to get back to the point that if EPA didn't know about the printer issue, that's only because, as I was alluding to, it spent months and months ignoring his efforts to continue the discussion after his initial objection slash rejection of the remote work offer, and EPA obstructed it. Now it cannot- This may be the most important thing I say this morning, your honors. So what was the basis that he said he couldn't work at home? Because he has a severe allergic reaction to certain organic compounds, certain allergens. That was the disability that EPA formally recognized. And emissions from his printer would trigger the allergy. Why does he have to have a printer? So there is, first of all, there's testimony that EPA says that, and it's brief at one point. It says there's no evidence in the record that he needed to print as part of his job. There is, I'll identify in just a moment, but I would submit you don't even need it. It is a reasonable inference and thus has to be drawn in this posture in Mr. Ali's favor that an economist working at the Environmental Protection Agency will need to print, but in any event- He can print remotely and then have somebody email the thing. So you're, Judge Kanoff, and EPA is speculating- The doctor, at least the part of it that's not under seal, never mentioned printer emissions. EPA's own formal determination of the disability is broad and says the allergy extends to a wide range of compounds, and EPA has not argued in this court- Well, if that's true, Judge Randolph, that's enough. We're at summary judgment and it was granted against him. So he has testified repeatedly, yes, that that causes, that triggers allergy. The medical evidence is consistent with that, and even EPA, I want to be clear to you, Your Honors, is not arguing here on appeal that that is a reason to affirm. If I can just make maybe the most important point I would make this morning is that it cannot be the law that an agency can willfully blind itself to information that would render its accommodation unreasonable and then insist in court that the accommodation must be deemed reasonable precisely because of that ignorance. That would give agencies all sorts of incentives to do exactly what EPA did here, which is to pretermit the interactive process and thereby cut off the flow of information when the very purpose of the interactive process is to allow for information flow so that appropriate accommodations will be identified. The bottom line is EPA's position will be fewer reasonable accommodations being identified for disabled employees. Let me just probe a little bit that your position on the relationship between the interactive process and the reasonable accommodation, say that there is a familiar kind of disability and the employer has worked with it before, and this is what the employee has. And promptly when the employer learns of the disability, it offers an accommodation that is plainly reasonable, maybe something that the courts have already seen for someone with a more serious version of what this employee has and the employer offers it. And the employee doesn't specify any other alternative that it wants the employer to hear this is and then doesn't get back to the employee when the employee says, I don't like that. I don't like that. Is your argument really that the employer can face liability? And on the hypothesis, the accommodation is reasonable. OK, on your hypothesis, if it's reasonable, then no, the employer can't face liability for failing to offer a reasonable accommodation. Now, I have proposed an independent grant. Right. But I do want to be clear, Judge Pillar, that I believe summary judgment has to be reversed independent of that separate argument about EPA participating in bad faith in the interactive process. Obviously, failure to provide a reasonable accommodation is by itself a ground for liability. And because of what I've articulated, a reasonable jury could find here that a reasonable accommodation was not offered. But Judge Pillar, on your hypothetical and on the ground of bad faith liability, I agree on your circumstances. It would be a stronger case for the employer because this is very fact specific. Of course, both aspects of liability and a jury could find in the circumstances you describe that it really was on the employee. I'm just not sure that I'm following your answer. Your answer was cabined. You said that they can't be liable for failure to offer a reasonable accommodation. But my question really is, could they nonetheless in that circumstance be liable for failure to continue the back and forth? And my submission is in theory, yes. Now, given you the hypothetical, because there is not this clear dichotomy between process and substance that is between the interactive process and the substantive reasonableness of the accommodations. And this case illustrates why when you've got an agency that is cutting off communication and sort of a first offer and then we're done, right, the agency is putting itself in a position where it's not going to hear information that could show its reasonable. Take this case. If EPA had continued the discussions with Mr. Ali, taking him up on any of his six, seven offers to talk further, they could have said, why did you object? He could have said the printer issue again, assuming they didn't already know. And then further discussions could have been had about ways to deal with that, perhaps as Judge Randolph was suggesting, remote printing or various other. But EPA can't rely on speculation about those possibilities here when they didn't continue the conversation. They can't get summary judgment on that. This is a printer he owns. It's not clear in the record, Judge Pillard, whether he even had a printer at home, but it doesn't matter. The point is, as long as you have a little bit, if he has a printer at home that he purchased and that he uses for personal use, it makes it a pretty tough inference that he couldn't work with that around. Well, here's why I think it's not necessarily that tough, Judge Pillard. Although, again, it's not clear in the record whether he has a printer at home. And given the posture, I think we have to assume he doesn't. But he testified at his time at JA89 to the point that, look, the allergy is triggered by the emissions the printer gives off when it prints. In a few minutes, those emissions dissipate. He can go pick up stuff from a printer and the emissions will dissipate more quickly when the printer is in a wide open space, as you might imagine. And again, JA89, he talked about this. The printer sitting in a big hallway in a government building as compared to it sitting in a small enclosed area like a private home. In that circumstance, it might be an hour until he could go pick something up. Five minutes may not cause a problem as far as ability to do work. A five minute delay between printing and picking something up. But an hour. Was the printer his only objection to working at home? No, he has raised additional objections about his spouse. And again, all of this goes to it's not all that developed in the record. But you can imagine, for example, we know from the COVID era, for example, that domestic violence went up quite a bit. Now, it is not an employer's obligation, obviously, to prevent domestic violence in the home. But it brings home the point that for a lot of people working at home is not safe. And again, all of this could have come out or whatever. Safe because your wife may attack you. Is that your point? Or a spouse? I mean, we're talking in this particular case, Judge Randolph, about a male employee with a female spouse, the record indicates. But of course, it can be flipped. I don't want to get. Do you work at home during the COVID shutdown? Um, well, COVID is much after the record. I don't know. I don't know the answer to that question, Judge Randolph, because COVID is much after the record closes. We're talking about all of these events are, as we discussed, 2011 to 2013. Now, he did work at home at EPA's direction in 2007 because of an allergic reaction that he suffered. He testified that he was barely J.A. 174 to 175, barely able to get his work done precisely because he did not have a lot of work at that time, as I do nowadays. That's the end quote. And he was ridiculed by other employees. He was ridiculed by other employees for working at home. I candidly don't remember that judgment, but I certainly take your representation that that is the case. Your Honor, there's much more I can say. I'm well over my time. I'm happy to proceed or sit as the court prefers. Your brief rested more substantially than your argument today on the notion that it's one thing to grant an employee who wants it a work at home as an accommodation, and it's very different to require it where the employee is against it. If we. There is a question whether he communicated, the record suggests that he did communicate to the employer that he had this ink problem, printer problem with working at home. But putting that aside, if he hadn't made any specific objection to working at home other than I don't want to work at home, in your view, is that sufficient and why? It is sufficient. I don't mean to run away from this at all compared to my briefs, Judge Pillard. I do want to say now you have to put aside to put aside the printer issue. You have to put aside not only the evidence that he told EPA at the time, but also the evidence that they told not to explain and the evidence that they didn't know if they didn't only because of them ignoring him for a protracted period of time. But Judge Pillard, with that long windup, yes, it would be sufficient. As I said at the outset, the other consequence is isolation and segregation of Mr. Ali. EPA doesn't claim that it was unaware at the time of that consequence. Of course, it was aware it's inherent in the accommodation and it undermines the reasonableness of the accommodation for a couple of reasons. We know that a driving factor behind the enactment of the Rehabilitation Act and of the EPA was to promote the integration of disabled employees into society and into the workplace. Twenty nine USC Section 701 EPA's accommodation would undermine integration. We also know the regulations provide that an even milder form of isolation and segregation that EPA offered here is prohibited. Right. The guidance to the regulation says employers cannot segregate in the workplace. You can't put all your disabled employees in one office or one floor and you're not even more mild form of isolation and segregation. And that's not permitted. The regulations also define reasonable accommodation in part as a modification or an adjustment that would allow the disabled employee to enjoy all of the privileges and benefits, the same privileges and benefits that non-disabled employees do. One of those privileges and benefits is in-person interaction. EPA's accommodation would deny that. And your honors, it is going to be the case very often that employers will have a strong incentive to respond to an accommodation request by simply telling the employee to go work from home because all manner of accommodations impose some costs on the employer, installing wheelchair ramps, installing elevators for people in wheelchairs. And it will simply be easier for employers most of the time. And of course, we're talking about federal employer here, but it's going to apply in the ADA context as well. It will simply be easier for the employer not to incur those costs, not to build those wheelchair ramps or install those elevators and just force the employer, all of their to work from home. What if we think that we are required and I'm not saying that I think this, I'm trying to probe your legal question, but what if we read the record that we are required to treat Mr. Ali as also taking a kind of my way or the highway? He again and again and again, he didn't say, let's talk. I have more concerns about work at home. He said, I want to I want a separate office, I want a separate office, I want a separate office, I want a separate office. I don't want a different cubicle. So the area between the two is. He's saying I want a separate office, the employer saying that's not practicable, the employer is saying, you know, cubicles aren't working, work at home and the employer is willing to stand on the reasonableness or not to work at home. And doesn't think that the separate office is going to be constructed. So what more is going to be learned in a situation like that? So two responses, Judge Pillard, I have to fight the hypothetical just briefly before I delve right into it and say he did not just say I want a private office, want a private office, want a private office. Look at J.A. 241 when EPA finally responded to him after seven months of ignoring him and said, we understood you to reject our remote work accommodation, but we're happy to reopen it. He writes back J.A. 241 and says, I would be happy to discuss or settle the issues. OK, so not like I'm only going to do a private office or anything like that. EPA never responds so that so all of that is critical because, again, the question is just, could a reasonable jury find in his favor? But Judge Pillard, to your question, if he had just kept saying reasonable, that would then be a jury question, right? Who would a jury I'm not saying a jury couldn't find for EPA on this record or on hypothetical record that you have just posited. The question is, was this supposed to be even was his Seventh Amendment right to a jury supposed to be even taken away from him? So a jury was not even allowed to answer the question of whether an agency that blocked communications for seven months and of course, without having talked to him, correct. And there's an asymmetry here, right? I mean, he is one person. He's an economist. He's not a lawyer. He's not an HR person. You look at the record. EPA was going to talk to its HR people. It's going up and down the seniority chain. They obviously have much more experience in this area. So I don't think it would be at all unreasonable. It's really not precluded for a jury to say, yes, both sides have obligations in the interactive process. We know that from Ward. But on this record, when you've got both people saying no, no, yes, yes, they're just at loggerheads. We're actually going to find for the employee employee again, not required. But this is summary judgment. The question is whether he gets a trial. There is an information asymmetry on certain points, but isn't doesn't the law require the employee to propose reasonable accommodations? Well, do you agree with that or not? No, that's not my understanding. Judge Pillard, the obligation that Congress placed is on employers to provide reasonable accommodations. There are certainly obligations on employees to provide information, as Mr. Ali did three times when he was asked to provide medical information or medical information and more medical information. This is simply not an individual who was trying to stonewall. He certainly had his preferred accommodation and concerns about the accommodation that EPA offered. But a reasonable jury could find that he made all of the necessary efforts and find the reasons I've said that the proffered accommodation was not reasonable. And is it not lawful to to prohibit employees from wearing scented products in the? I don't know the answer to that question. EPA took the position, Judge Pillard, that they had consulted with their labor relations folks and been told that they could not direct the employee whose cologne was causing the principally causing the problem to stop doing so. And there's evidence in the record that he was asked and cajoled and simply declined. But it the the mandate the law puts on the employers to provide a reasonable accommodation and a jury could find EPA to. Unless the court is for the questions, I'll save my two minutes. Thank you very much. Thank you. Good morning, may it please the court, Johnny Walker for the administrator of the EPA. Your honors, the EPA engaged in an interactive process with Mr. Ali to determine a reasonable accommodation for his workplace allergies. And on June 21st, 2012, it approved up to full time telework as a reasonable accommodation and denied Mr. Ali's request to move from a cubicle to an office under the EEOC guidance on the Rehabilitation Act. It is ultimately the choice of the employer to decide which reasonable accommodation will be afforded. Mr. Ali's supervisor, Denise Hawkins, made the decision to look at that guidance. OK, sure, doesn't just say. That. It's they're supposed to involve the employee, consult with the individual with a disability in consultation with the individual and considering that person's preferences. Come up with a reasonable accommodation. Yes, but it also says didn't do that, they said, we're going to talk to you. And you're supposed to obtain the specific physical limitations before doing so. Judge, the EPA said we're going to talk to you to come together. Their form letter was certainly accurate. We're going to do that. But they didn't do it. Judge, I'm just just to finish my point here. They just said. We found you disabled. We're going to talk to you, but didn't and drop this reasonable accommodation on him within this, you know, within within the hour, that is not at all what EPA did, what EPA did is when Mr. Ali reported that he was having allergic reactions in the workplace. Ms. Hawkins conferred with him and filled out reasonable accommodation paperwork for him. That reasonable accommodation paperwork shows that she collected information from Mr. Ali. It specifies what the exact accommodation that he requested was. It notes that he requested an office with four walls, a door and a ceiling. She also, in addition to conferring with him in advance of deciding the reasonable accommodation about which accommodation he wanted, she also conferred with him about the nature of his disability. He initially submitted a bunch of outdated letters that had already been rejected by the agency and by a district court and by this court in litigation. He then submitted an updated letter that was just as vague as those updated as those old letters. So she asked him to submit yet another letter. That letter is disputed that he has a disability. He he ended up getting the materials in. So I think the point are you suggesting that Hawkins was frustrated with all that back and forth and therefore had done enough? No, no, no. There's no evidence at all that she was frustrated. I'm just trying to respond to the contention that nobody conferred with Mr. Ali about the nature of his disability or about the nature of the of the accommodation and how it matches the established disability. So that's really if you focus on that's what we're concerned. So they both they both understood the nature of the accommodation that he was requesting. And after getting updated medical documentation, they understood the nature of his disability. Understood it is including not just perfumes, as you talked about in your brief, but volatile organic compounds. Absolutely. So we noted in our brief that the perfumes were certainly the focus of it was what prompted his communication with Miss Washington. But but I think we acknowledge, you know, Amicus makes the point in the reply. And we completely agree that he that his doctor noted that he had multiple allergies to a number of different compounds, some specified, some unspecified. Right. And on June 21st. Did Hawkins say. She will talk to him before proposing a reasonable accommodation. You're right. Yes, she did. She had she talked to him. That same day before she because that same day is when she issued the work at home. It's that I will talk and then issue the reasonable accommodation between the communications that I will talk with you and the paper that said, here's your reasonable accommodation between that time. Did she talk with him? Should we? She certainly talked with him in order to the reasonable accommodation was at that date. And she's certainly talking about. I'm going to try this again on June 21st. She says. We recognize you have a disability. I'm going to talk to you before proposing a reasonable accommodation. Right, that's in the record. On June 21st. She then offered. The work at home or proposed the work at home accommodation, it was approved, that was a final approval on the same approved on the same day. Did she between those two things when she said she would talk to him and when she issued what you're calling the final approval, did she speak with them? Does the record or did only ask you, does the record show any evidence that they spoke in that window? It was all done at the same time. What the record shows is that she conferred with Mr. Ali, certainly when she filled out the paperwork that form she issued a form. I'm going to try this one more time. I'm asking about a specific window of time. She issued the form that said, we find you disabled and that form set. I will talk with you before offering a reasonable accommodation, correct? Correct. It looks like and then she offered the final. Accommodation. So there may not have been any window of time, maybe it was all maybe it was the same exact same moment, but let's assume there's a window in time between I will talk to you. Here's the final offer of accommodation. If there is anyone, you can tell me if there's no window at all, but there is a window. Did she does a record show that there was any communication? It appears that that determination of disability was issued on the same day as both the approval of the telework and the denial of the office. And the reason for that is I'm not asking that. I'm asking, is there any record evidence? That she spoke with him as she said she would. Well, yes, there's definitely record evidence that she spoke with him after on June 21st. I don't know about on June 21st has to be for the window that I'm talking about. There's no indication one way or another whether she spoke with him on June 21st, but she certainly spoke with him before. We have a record of it. If she did not necessarily. I mean, this is an interactive process. The regulations describe it as flexible and informal. It is not necessarily documented in some sort of there's no. So this is an open, factual question, whether having promised to speak with him before offering the reasonable accommodation she did, or you're saying maybe she maybe she didn't. We don't know. She certainly spoke with him before offering reasonable accommodation or between after offering to talk and offering the accommodation. That's the only window I'm talking about. I don't believe so, because I believe they were issued simultaneously. She may have also talked to him on that day. It's not clear one way or the other. What is clear, Your Honor? Ravenstone, I mean, if if if they say, OK, you can work at home, there's nothing to prevent him once they say that from coming back and saying, hey, wait a minute, let's talk this over. There's no problem with that. There's no law requiring that. No, that's absolutely right, Judge Randolph. And it's an important point that I want to hit, because the record actually indicates that many management officials did speak with Mr. Ali after the agency approved that telework. And again, that approval came after they had considered as regulation as the EEOC's guidance says employers should do. They considered his proposal for an office and determined that telework would be more appropriate. They immediately approved that. What did she mean? They approved. What did she mean when she said on June 21st? In finding the disability at this time, I would like to meet with you to explore and discuss. What did she mean? I think it means that that that it refers to what the interactive process you. Your Honor, I want to be clear that there was discussions with him beforehand. They had already considered his proposed accommodation. And I want to be clear that there were also discussions with him afterwards. Did she mean it or did she not mean it? She did speak with him. I don't think there was any reason when she said at this time. That time was June 21st. She certainly or offering a reasonable accommodation. I would like to speak with you to explore, explore and discuss. Your Honor, at that point, there was no reason to delay. Mr. Mr. Ali has complained. She absolutely meant it. And she did speak with him. Mr. Ali has been complaining with him on June 21st. As I said, the record doesn't indicate one way or the other. OK. All right. But she said on June 21st, before the accommodation, let alone the proposal, let alone the final. I would like to meet with you to explore and discuss. She already knew at that point about his request for an office. She also knew that for four years he had worked perfectly fine in a cubicle. Until EPA decided to take this person who had so much cologne, he was making people not just setting off asthma and put them right next to the guy who has severe allergies. All right. He then he's looking for their cubicles, yes, he asked for a private office, he probably thought that would be the safest thing for him, but he tried other cubicles, he tried talking to the guy. He was trying a lot of other and he was emailing nonstop. But what I'm confused about is why on June 21. He said. At this time, I would like to meet with you to explore, knowing. His office requests, she's not done, she said, let's explore and knowing he'd been doing some cubicle hopping. Right. Right. Let's explore. And knowing the cubicles can work for him because I had worked for four years, they just don't put his employment. So let's explore. And then she didn't explore. She issued a final proposal and then they ignored his email. No, no, no, your honor. They did not ignore his emails. Let me let me get into the multiple verbal discussions that she had with him. She testifies at J.A. After June 21st. Yes. After June 21st. And again, there's no reason to that. Mr. Ali complains that he is having allergic reactions in the workplace and there's no reason to not approve him immediate relief before having those discussions with him about about that further. But at that point, there's no indication that that was not a reasonable accommodation. But even still, the agency does speak with him further. Denise Hawkins at J.A. 105. This is on page eighty five of her EEOC hearing. Testimony says that she had several verbal conversations with Mr. Ali, where she said that the agency will provide Mr. Ali with whatever he needs to work for a home. It will purchase office equipment for him and that it can be a fully flexible arrangement. He can come into the office as much as he wants and he can work his home as much as he needs for his health. And this is an important point. His cubicle is where he's going to have to work is next to this guy with so much perfume. He's making multiple employees sick. This is an important point because, well, I mean, your honor, he cannot be in any cubicle in the office. But we know he can be. He was in a cubicle for four years. But then he says he asked him to move this person. He asked them to ask this person not to wear cologne. And they said you move. And the information from his doctor says that he is allergic to multiple things. Yes. In the workplace, the symptoms are worse. False that he worked successfully for four years in a cubicle. It's true. It's also true that I showed up. That's true. It's also true that he worked for six months successfully on telework in 2007. It is not. It is very much a disputed fact because he says he was ridiculed by other employees having worked at home. He says that he was ridiculed by other employees for having worked at home, that he's concerned about the fumes within his house. If he has to do whatever volume of printing, we don't know. Disputed fact at his house. Maybe it's no printing. You win. Maybe it's a lot of printing. That's an issue. He's concerned about. So I don't think that's fair to say at all. And he says there are all kinds of litigation and stuff. They let me work at home and then they told me to get back. So it was very unsettling for him when it happened for that six months before. There's no admissible evidence that he brought that to the attention. He brought a home printing to the attention of his employer during the interactive. There is actually there's the OCR report. Well, he he testified that he told the management contemporaneously. I mean, a jury might just disbelieve it, but that's not evidence that we can make a finding about at summary judgment that could be reduced to admissible evidence. You do refer to this little evidence in your brief, but a party's testimony about what he said could just as Miss Hawkins testimony about what she had in unrecorded conversations. But at this posture, no, no, I think I think all that is correct, Your Honor. But I think that he testified in his deposition that that was an issue. I don't believe he testified in the deposition that he conveyed that management. What what amicus refers to to say that he conveyed it to management is notes from an EEO counselor in the OCR report. But I believe he did say. Then in the OCR report that he had told them he did say that in the OCR report, absolutely. But the problem with that is it's not only the OCR report is not only hearsay hearsay within hearsay. And so while the OCR report may be converted to admissible evidence, the hearsay within it cannot be converted to admissible. Well, he's but he's a party and he said something that if it is true, creates a material issue. Understood. But but even getting past that, what he says in the OCR report is if he had to print something at home, it would exacerbate his allergies. He doesn't say that he would actually have to print something at home. Where's the evidence in the record on that question of whether he'd have to print or not? Well, the evidence is that he would not because, as I said, that evidence, the accommodation that was afforded to him was that he could come into the office and use it as much as he pleased and work from home as much as he needed. He says, I can't. I mean, that's a premise of offering this work at home thing was that there's nothing we can do to accommodate you here in the office. Well, nothing we can do because you're allergic to so many things. So the only thing we think is reasonable is for you to go work at home. That is the entire premise of their offer. So I understand it. And so then to say, well, you need to print, you'll have to come into that office that we sent you home for because you can't work function in the office. Yeah, I think the I don't think there's any the employer didn't determine that he can't be in the office at all. The employer certainly accepted that you talked to him, might have gotten some more information. And the employer certainly accepted the medical information after repeat follow ups from his medical provider. He was allergic to multiple things that just following the medical report is sufficient. What is the EEO guidance vision talking directly about specific, not just the general and not just the medical information, specific needs of the individual? The guidance says that it should learn the needs of the individual, which it did through repeated follow ups for medical documentation with the employee. But it also says the ultimate discretion to choose between effective accommodations. Let rest with the employer. That's not exactly what that is. A quote on page four. Twenty four. Want to read the whole thing? It's twenty nine CFR. This is the appendix to part sixteen thirty on page four. Twenty four of the two thousand three edition says. If more than one accommodation will enable individuals to perform the essential functions or if the individual would prefer to provide his or her own accommodation, the preference of the individual with a disability should be given primary consideration. However, the employer providing accommodation is the ultimate discretion to choose between effective accommodations. Exactly. OK, I'm choosing between effective accommodations. According to him, there's a fact dispute. There's a fact dispute that there's no fact dispute that the employer allowed him to work at home as much as he needed to provide for his health and that he could come into the office. If they say that there's a factual dispute as to whether working at home was an effective accommodation, then. That then that's a material dispute, the things that they say that make working from home and ineffective accommodation is the isolation that having to use a printer, but but none of that is inherent. And Amicus characterizes the accommodation because it's not inherent about the isolation of working from home because he can come into the office as much as his health permits. If I don't, I'm sorry, I'm just really confused here because. The explanation I saw on the record for work at home was you are allergic to so many things. That just doesn't seem like you're going to be able to work here and we can't do private office. We don't have one for you. Maybe other sections do, but we don't have one for you, so it's not going to work for you. There's nothing we can do for you here in the building work from home. And then to say that was an effective accommodation because he would have to come in to do things. I mean, if he can come in to do some work. Are they going to accommodate him while he's in there to do this flex work? What are they offer them if he cannot even be in the office for an hour to use the printer or be in a common area and then the office would the enclosed office would not be an effective accommodation because he would have to be in the common areas in order to do that. So we know that he can, in fact, function in this office because he did for on a limited basis. Yes. For four years. That's a pretty long time. I wouldn't call it a limited. Well, but I mean, what he testifies is that by the time he requests the accommodation. Is his doctor is saying he has multiple allergies are exacerbated by work and he says that he cannot even be in a cubicle that is in a high traffic area because the possibility of an individual with perfume simply passing by him will exacerbate his allergies. And that's the information the agency is working on here. But the fact that he. But right. I mean, the agency can say we're going to take the position that that is a reasonable accommodation and stand on that. And it didn't. I find the the study about the workplace air quality a little bit frustrating because the agency uses it to say, even if you had your own office, that wouldn't. Resolve the situation because the air quality is the same in and out. I don't know about you, but I've worked in offices with people in open cubicles and fragrances versus a closed office, and actually. I mean, I trust the record is what the record is, but apparently that was done on a day when there weren't. You know, the person who was mainly causing the problem wasn't present, and I'm just not sure what to make of that. This is what it is. I think it doesn't necessarily say something to him being directly proximate to someone with the perfumes. But, I mean, he's saying that he can't be in a cubicle anywhere within an environment anywhere within that environment. And he's also saying that there are workplace allergies other than perfumes and colognes that exacerbate his allergies. So I think that the air quality test does speak to those. Are they testing, is that air quality test for his allergens? It did. It tested for volatile organic compounds, and it also tested for fungal matter. And it found actually elevated fungal matter in the cubicle area. It not really, your honor, what the, what the report says is that the proper comparison is not between the two areas that are tested. The proper comparison is the indoor readings with the outdoor readings. So you had a 110 colony producing units per square meter at the cubicle, and you had 210 in the office. That compares, I'm sorry, that's reversed, 210 at the cubicle and 110 in the office. That compares to 5,700 outdoors. And so what you have is both of those levels are extremely low. No, but if it's higher, that would include things like mold allergies. If it's higher, double in the cubicle than the office, for him to figure out how he gets to and from work. The scientists who did this invest, there's no fact disputed fact at all there, because there's no indication that 210 CFUs per square meter would be any different than 110 CFUs per square meter. Yes, the person who, yes, the person who conducted the test said that the appropriate comparison is not between the two measured areas. It's between indoor and outdoor. You say for somebody with allergens as severe as Mr. Ali's, it doesn't make a difference. Your honor, I think there's no dispute effect. There's, there's no evidence in the record at all at 210, as opposed to the 50, which is far lower than 5,700. I mean, this was a general error test. There's no finding one way or the other, but, but what we know about the way measurements occurred and how they compared to outdoors indicates that they are both extremely low indoors. And I just, I wanted to get in one point. I was trying to get into the verbal conversations with Mr. Ali. And I think these are important because I think a lot of miss of amicus's arguments are built on this assumption. That Mr. Ali was forced to banish himself from the office and definitely, and there were a number of management officials made clear to him after the accommodation was offered that he could be as flexible as he wanted and come into the office as much as he was capable. Miss Hawkins testifies to that at 105 at 185. Miss McCoy testifies to that at 115 at 222. Mr. Wavin, who was Miss Denise Hawkins deputy testifies to that at SGA 232. We mentioned this in our red brief. But amicus just built on this assumption that he was banished indefinitely from the office. And that's what all of the arguments based on this not being a reasonable accommodation are based on, but they are not consistent with the record. After the accommodation was offered, did Mr. Ali continue to find, try different cubicles? I believe he did. I believe he ultimately settled on a cubicle. After the reasonable accommodation was offered, and he would mention, like, this cubicle didn't work and this didn't, we have emails about he tried some, they didn't work. But you said he eventually settled on one. And then, did he also, there's also evidence, is there not, that he told, I can't remember if Denise Hawkins was CC'd or direct, but mentioned to supervisory people that he had tried talking to a cologne employee about wearing less cologne, right? Yes, and there's also indications that the EPA talked to the cologne employee. They also conferred with their labor and relations people to see if they could ban people from wearing cologne. They were informed that they could not. But there were multiple efforts to try to address Mr. Ali. So after this accommodation was offered, and he said it's not going to work for me, he was trying other things and reporting back to them the things he was trying and on the results. As was the EPA. You know, the EPA made clear to him that his work from home arrangement was as flexible as he wanted to be. We know that they also offered an air filter for his cubicle. They suggested that he participate in a cubicle reassignment process. All of these are interactions with Mr. Ali that are not necessarily part of the written record. I think amicus is incorrect to confine the interactive process to just those written emails. Sounds like the interactive process just kept going then. I think the EPA was certainly willing to continue discussions with Mr. Ali. But I think that once the EPA offered Mr. Ali a reasonable accommodation. I was talking about the post-offer period. I thought you were talking about the post. So I'm talking, I mentioned the things that Mr. Ali was doing. I said after the work at home accommodation was offered. I thought you were describing things that EPA was doing after the reasonable accommodation. I was. I wouldn't quite characterize them as an interactive process because the interactive process is meant to come to a reasonable accommodation. I think we did that in June of 2012. But EPA was certainly willing to continue. But the testimony you had pointed to of Ms. Hawkins says that there were conversations back and forth between January and June of 2012. When she said that the offer was completely flexible. He could stay home as much or as little as he wanted to. He didn't have a printer. We could get him one. And then she identifies that as taking place, as I read it, January, between January and June. Can I trouble you for that J8 page one more time? It's 105 to 106. Thank you, Your Honor. It's a little unclear whether when she's talking about back and forth, that's really the period when she was getting the medical documentation. I'm just looking at the page numbers that you read out. Right. As supporting the idea that there was verbal back and forth. So certainly she had those conversations with him. And then I think the other management officials also testified that they continuously told him that he could work from home as much as he wanted to. They don't give a time period in that particular testimony. So is there record evidence? I know there's the later communication. I'm not remembering if it was from Denise Hawkins or somebody else. Where after about six or seven months had gone by with him emailing about his progress or lack thereof on cubicle hopping and talking to the Cologne employee. There was an email that said we've offered you reasonable accommodation working at home. Nothing about flex there. But just working at home. And you've got fit. Some phrase to the extent of let us know if you want to discuss further or something like that. He emails back as counsel said, yes, I would like to discuss and settle this with you. Was there anything else post final accommodation offer? And that email. Post June 2012 to that email where you're saying the record shows that there were informal oral communications or email communications? Where did I find that in the record? The J sites that I listed. We know that some of the undated conversations discussed by Ms. McCoy and Mr. Wavin may have been after June. We certainly know that after June, the agency continued working with him to some extent because they offered to provide the air filter in his cubicle. They suggested a means for him to obtain a cubicle in a more permanent location. But as we've argued, reasonable accommodation was provided in June of 2012. The agency does not violate the statutory provision requiring it to make a reasonable accommodation when it has provided a reasonable accommodation. On the on the office question, you know, it seems like one of the things that Mr. Ali was concerned about and felt not heard about was that he had had an individual office. Then he was moved his job and he was working in S.H.P.D. And he said, you know, there were empty offices still in E.A.D. It's the same agency. I understand it's a different, what is it, division or project within it. But he also, according to his observation, said there was a fellow who was given an office in E.A.D. Because the organization that she reported to didn't have space in it. So I guess the question is, I mean, accommodations sometimes involve organizations going out of their usual path to make something work. And it's a little hard to tell from this record what the agency's position is on why it couldn't work something out with a sister division to find an empty office. Yeah, I acknowledge the record indicates that that was not fully explored working with a sister office. But I think our contention and the reasoning of the agency in denying the office is not necessarily that it could not under any circumstances provide the office. What Ms. Hawkins said was that she determined, she decided on telework other than the office, which, again, is the employer's determination to make. Because given the medical documentation, Mr. Ali's complaints, that was going to be the most effective accommodation for him. Because it would permit him full control over his environment. And it would also prevent him from being exposed to common areas in the office, like the pantry and the restrooms and the hallways, where Mr. Ali might encounter someone wearing colognes or perfumes that would trigger his allergies. Questions? Your position on if the accommodation that's offered is work from home, and this is in response to Amika's argument about work from home that the accommodating employee seeks, versus work from home that the accommodating employee really does know. If somebody said, I don't want that. I don't want to work at home. That doesn't work for me. Is it your position that that is not enough to show that the accommodation is not reasonable? That is not enough, Your Honor. Why? That's dictated by this court's decision, ACCA versus Washington Hospital Center, which specifies that the obligation of the employer is to provide a reasonable accommodation, and not necessarily the employee's preferred accommodation. Right. But my question, I think, goes to the premise of your answer, which is, is it a reasonable accommodation if the person, I mean, in the example that Mr. Bolchak pointed to, that I recognize there's no evidence of that in this case. But if somebody does fear abuse at home and doesn't want to say, but just says, you know, I don't want to be there. You're saying it's the employee's burden, then, to say why they can't work at their house? Yes, absolutely. I think the reasonable accommodation, in terms of what is a reasonable accommodation, I think that's defined in the regulations. And it's a modification. And for these purposes, it's a modification of the way the work is done in a way that will allow the employee with a disability to perform the essential functions of the position. I think if they're saying your accommodation is to go home, and their home is a place of such fear and dread because of a domestic violence situation, I think that's certainly an instance where they would not be able to perform the essential functions of their position at home. But Mr. Ali has not said anything like that. I mean, you know, he has early on in his pro se, he has like a takings clause. And there's something to the notion that if you're hired to come into an office, and this is, you know, 2020 hindsight, we're in a very different culture and practice on telework. But if you're not hired as a contractor who's responsible for their own work environment, but you're hired to come into an office, and the accommodation is you go somewhere else, that and the person says, I don't want to go somewhere else. Your view is that that is what more is required for the employee? Do they have to say I'm abused at home or have to say what? I think they would have to demonstrate that that is not an accommodation. That's not a modification that would allow them to perform the essential functions of their position. And being in fear of a domestic abuser would certainly be that kind of situation. And if they said, well, my spouse and I do better when we have time away from each other. It's one of the reasons I'm continuing to work. You know, my spouse likes to read quietly and sometimes have friends over for lunch. Would that make it not a reasonable accommodation? I think so. I think that falls into the realm of a preference, an employee preference, which, as Aka said, that if the employer offers an accommodation, a reasonable accommodation, even if it's not the employee's preferred accommodation. You said, I think so. But your explanation makes me think that you meant to say, I think not. Oh, yes. I think I think not. If it's simply that my wife and I prefer to have some time apart. That would not make the accommodation unreasonable. That's correct. That would be that would be in terms of just an employee preference, which, as Aka says, it's not about employee preference. It's about whether or not it meets the definition of a reasonable accommodation, which is that it is a modification that permits the employee to perform their essential functions. Thank you very much. Thank you, Your Honor. Please affirm. Your Honor, my overarching response to the arguments you just heard is the procedural posture. We are on summary judgment. The record has to be viewed at the light most favorable to Mr. Ali. And the question is, could any reasonable jury find that he was denied a reasonable accommodation? I submit the answer is, of course, he could now. Counsel says, why do I focus on the written record? Why am I limiting myself to the written record? Well, that's what courts do in deciding summary judgment. They look at the information in the record. Now, Mr. Counsel for EPA says there were oral conversations and he and Mr. Ali was offered a more flexible arrangement when he could come in when he wanted. First of all, the conversations he's talking about, as I think Judge Pillard was discussing with him, they're all undated. So they might have occurred prior to the issuance of reasonable accommodation. But in any event, the question is, could a jury, number one, find that that was not the case? That the offer was 100% telework? And of course, a jury could find that. First of all, JA-208, the formal offer that was made, says permission to work at home full-time, quote-unquote. And JA-241, subsequent in time to all of the oral conversations EPA counsel was just relying on, this is the email that came back finally after EPA ignoring Mr. Ali for seven months. EPA says, you have been offered a reasonable accommodation of 100% telework. Would a jury have to credit that? Or could they instead credit the oral conversations that EPA counsel was talking about? Maybe they could. Would they have to? Reject the written evidence in favor of the oral test? Of course not. And that's why this gets to a jury. Now, there was discussion about the air filter and the air quality test. I frankly don't understand the relevance of this. EPA did not argue in its brief for affirmance based on the offer of an air filter. So that's waived on appeal. In any event, Mr. Ali testified in his deposition in this case that he had previously tried an air filter and not had success with it in a job in West Virginia. A jury could credit that evidence. As Judge Pillard was discussing, I think in addition to the air quality test itself, it was done over a 24-hour period. And it is not clear whether the employee whose cologne was causing all these problems was either there. JA-96 to 97, Ms. Hawkins says she doesn't know if he was there. JA-111, Ms. Heisel-McCoy says she doesn't know if he was there. So the air quality test is, I submit, not at all relevant here. Judge Millett, you were absolutely correct in the extended colloquy you were having with EPA counsel. There's no evidence of any discussions in the period between the issuance of the formal disability determination in June 2012, JA-206, and the issuance of the approval to do telework same day in June, JA-208. It would not be hearsay for him. Just to interject, you had mentioned the permission to work home full-time, JA-208. And then I thought you mentioned JA-248, but it's clearly not the right period. JA-241 is the email in March 2013 from Ms. Heisel-McCoy to Mr. Ali in response to the seventh email, and the sixth they had ignored. But finally, they say, Ali, you have been offered a reasonable accommodation of 100% telework. So this notion of there was an option to come in as much as he wanted, the jury didn't have to find that that offer was ever made. And a jury could find, if it was made, that it wasn't reasonable. The record shows that he lives outside of Washington, D.C. The notion of coming in a couple of times a week or whenever he wants to, first of all, the whole premise of this, Judge Millett, as you were discussing with him, is that the office is, at times, in many ways, not a safe place for him to be. But in any event, the notion of he could just get out of his segregation by traveling 10 miles a day, the consistency, whether that's a reasonable accommodation, all a question for the jury. How did he get into work? I'm sorry? How did he get into work? I'm not aware of information in the record about how he commuted to work, Judge Randolph. He didn't walk? I'm quite confident he did not walk. He had to take public transportation or private transportation? Yes. Right. And the car fumes don't bother him? There's no evidence to that effect. Now, of course, to the extent the court was willing to get into this, and EPA is not arguing for affirmance based on that. You made a statement that the air quality test was not relevant. You didn't mean that, did you? I do not believe it is relevant to whether summary judgment should- What's your definition of relevancy? I would take it right out of the rules of evidence, tending to make a material- That makes a fact of consequence more likely with the evidence than without it. Correct. So how can that possibly be not relevant? It's more likely that the air quality was the same within the building with all the cubicles and the private offices, with that evidence than without it, isn't it? No, Judge Randolph. No. No, for the reason I was suggesting a moment ago, which is that there's no evidence and, in fact, people testified they weren't aware whether the person whose cologne was causing the problem- It doesn't have to be conclusive. It has to be more likely with the evidence than without it. So it's clearly relevant. I don't mean to get hung up on relevance, Judge Randolph. I don't think it bears on the issue- You brought it up. My apologies, Dan. I don't think it bears on the issue, principally because EPA is not arguing on appeal in this court that summary judgment should be affirmed because of the air filter test or its- air quality test or its offer of an air filter. It certainly would not be hearsay, as, Judge Pillard, I think you were discussing with EPA counsel, for Mr. Ali to just get in the witness chair at trial and say, I told EPA at the time about the printer issue. The evidence I pointed to before suggests he would do that, seal JA50, JA89, JA236, and it wouldn't be hearsay because it would not be offered for the truth of the fact that he was, in fact, allergic. That's not even disputed here. It would be offered for notice, which is obviously outside of the truth of the matter permitted. Now, Mr. EPA counsel said at one point that there is no evidence in the record that he needed to print. I alluded to it in the beginning. There is evidence on JA47. Ms. Hawkins affidavit to the EEO during the EEO proceeding. She said, quote, Mr. Ali would need to print from the internet whether he was at home or in the office. So even if you don't accept my earlier argument that's a reasonable inference that an EPA economist needs to print from home, a jury could rely on that evidence to find that he did. Your Honor, unless the court has additional questions, I'll ask for a reversal. All right. Thank you. Mr. Volchek, you were appointed by the court to appear as amicus in support of appellant's position in this case. And we thank you very much for your assistance. Thank you, Your Honor. The case is submitted.
judges: Millett, Pillard, Randolph